```
                IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                           AT BLUEFIELD

INTERNATIONAL UNION,
UNITED MINE WORKERS OF
AMERICA, et al.,

        Plaintiffs,


v.                              CIVIL ACTION NO. 1:16-12506


CONSOL ENERGY, INC., et al.,

        Defendants.
```

## I.   INTRODUCTION

This is a civil action for an order enjoining Defendant CONSOL Energy, Inc. ("CONSOL Energy") and its wholly owned subsidiaries Defendants Helvetia Coal Company ("Helvetia"), Island Creek Coal Company ("Island Creek"), Laurel Run Mining Company ("Laurel Run"), and CONSOL Amonate Facility, LLC ("CONSOL Amonate"), from unilaterally terminating a group health insurance plan. This plan, named National Bituminous Coal Wage Agreements ("NBCWA") Plan, is maintained in order to benefit retired coal miners. The NBCWA contains a resolution of disputes ("ROD") mechanism, and it is connected to the parties' collective bargaining agreement.

Presently pending before the court is Plaintiffs' Petition for Preliminary Injunction.  See Doc. No. 8.  The court makes its

Findings of Fact and Conclusions of Law as set forth in this opinion.

## II.  FINDINGS OF FACT

1. Defendant CONSOL Energy is a publicly owned energy company engaged in the operation of mines and facilities related to the production of coal, which it sells worldwide to electricity generators and steelmakers.  Defendant CONSOL Energy does business in the Southern District of West Virginia and has done so for many years.  Defendant CONSOL Energy maintains its corporate headquarters near Pittsburgh, Pennsylvania, and has an office in the Southern District of West Virginia at 2481 John Nash Boulevard, Bluefield, West Virginia 24701.

2. Plaintiff International Union, United Mine Workers of America ("UMWA") is a labor organization that represents coal miners.  The UMWA maintains its principal place of business in Triangle, Virginia, and has offices within the Southern District of West Virginia at Beckley, Charleston, and Chapmanville.

3. The various individual Plaintiffs are residents of the Southern District of West Virginia; they are retired coal miners and participants in, and beneficiaries of, the group health insurance plan at issue in this case.

4. Since shortly after World War II, health and retirement benefits in the coal industry have been provided to employees through a multiemployer arrangement.  This arrangement has been carried forward for over 60 years through collective bargaining or through legislation enacted by Congress.  Beginning in 1950, pension and health benefits for retired miners were provided through a single plan, known as the UMWA Welfare and Retirement Fund of 1950.  The guarantee of lifetime retiree health care benefits was contained in numerous subsequent agreements negotiated between the UMWA and the Bituminous Coal Operators Association ("BCOA"), known as the National Bituminous Coal Wage Agreements ("NBCWAs"), maintained this structure.  The UMWA and the BCOA have negotiated a number of NBCWAs over the years.  The most recent is the 2011 NBCWA (the "2011 Agreement"), which is now in effect.  Each of the NBCWAs, including the 2011 Agreement, has continued the obligation of the coal operators to provide health care to eligible beneficiaries on a permanent lifetime basis in accordance with a standard Employer Plan incorporated into the collective bargaining agreement.

5. In order to ensure uniformity among the Employer Plans established pursuant to the 1978 NBCWA, the UMWA and BCOA established the ROD procedure.  Under the ROD procedure

established under that contract, disputes arising under the separate benefit plans maintained by each individual employer were subject to resolution by the Trustees of the UMWA 1950 Benefit Plan.  In the 1981 NBCWA, the parties added language stating that the "[d]ecisions of the Trustees shall be final and binding on the parties."  That language has been included in every NBCWA since 1981, including the 2011 NBCWA.  The authority to resolve disputes under the contractually required Employer Plan was conferred on the four Trustees of the UMWA 1993 Benefit Plan (the "Trustees"), two of whom are appointed by the UMWA and two by the BCOA.

6. A number of CONSOL Energy subsidiaries—including but not limited to the subsidiaries that formerly employed the individual Plaintiffs—were members of the BCOA and signatory to the 1974, 1978, 1981, 1984, 1988, 1993, 1998, 2002, 2006, 2007, and the 2011 NBCWAs.

7. During negotiations between the BCOA and the UMWA that culminated in the 2011 NBCWA, CONSOL Chief Executive Officer Nicholas J. DeIuliis led the BCOA Negotiating Committee.  He personally signed for the BCOA in portions of the 2011 NBCWA.

8. On or about March 15, 2016, CONSOL transmitted to the retired miner participants in its Employer Plan a letter

4

stating that "[o]n February 11, 2016 we initiated discussions with the UMWA regarding new options for providing healthcare benefits" and promised that "[i]n all events, we will continue to communicate with you in the coming months about this very important matter before any changes are implemented." A similar letter was sent to participants on May 6, 2016. Both letters encouraged participants to contact the UMWA and UMWA staff subsequently fielded a great number of telephone calls from anxious retirees concerned about their health benefits.

9. Defendant CONSOL Energy indicated in correspondence to the UMWA that it intended to terminate and replace its Employer Plan. Subsequent negotiations between Defendant CONSOL Energy and Plaintiff UMWA failed to resolve disagreements over which changes, if any, would be acceptable to the union and its retirees.

10.    On or about October 31, 2016, CONSOL transmitted to the UMWA an official notice pursuant to Section 8(d) of the NLRA that all of its subsidiaries signatory to the NBCWA "have permanently terminated their mining operations" and that the subsidiaries would terminate the 2011 NBCWA effective as of its expiration date, December 31, 2016.

11.    On November 1, 2016, the UMWA filed a ROD with the Trustees noting the parties' dispute as to whether CONSOL

may "implement any unilateral changes or modifications of the benefits provided by its plan, either during the term of the 2011 NBCWA or following its termination" and asking for an order that CONSOL "notify its retirees that it cannot make any changes in their benefits without the agreement of the UMWA."

### III. CONCLUSIONS OF LAW, MEMORANDUM OPINION AND ORDER

### (1)   PERSONAL JURISDICTION AND VENUE

### A. CONSOL Energy has Waived its Personal Jurisdiction and Venue Defenses

The court commences with the affirmative defenses of personal jurisdiction and improper venue, defenses that Defendant CONSOL Energy first raised in its Motion to Dismiss for Lack of Jurisdiction. See Doc. No. 14. Plaintiffs contend that Defendants waived these affirmative defenses by failing to raise them in their first pre-answer motion. See Doc. No. 39. This court agrees in part: Defendant CONSOL Energy has waived its personal jurisdiction and venue defenses, but the other defendants have not.

Rule 12(b)(2) defenses such as the lack of personal jurisdiction and improper venue are deemed to be waived when they are not raised in the first pre-answer motion. See Elderberry of Weber City, LLC v. Living Centers-S.E., Inc., 2013 WL 1164835, at *2—3 (W.D. Va. 2013) (determining the defenses have been waived where "failure to object [on such grounds] in [a defendant's] first

motion to dismiss resulted in precisely the type of delay the Rule 12(g) consolidation rule is intended to prevent, prolonging the briefing process and delaying the adjudication ...”); Fed. R. Civ. P. 12(h) (“A defense of ... improper venue ... is waived ... if it is neither made by motion under the rule nor included in a responsive pleading or an amendment thereof....”); Buchanan v. Manley, 145 F.3d 386, 388 (D.C. Cir. 1998) (stating that “the defenses of improper venue and lack of personal jurisdiction are waived if not raised in a timely manner. . .”).  Indeed, “Rule 12(h)(1) specifically states that a party waives a 12(b)(2) defense by omitting to raise it in an earlier motion under Rule 12.” Elderberry, 2013 WL 1164835 at *3.

Defenses such as want of personal jurisdiction and improper venue are deemed to have been waived when a defendant fails to raise them right away in the first defensive move.  Defendant CONSOL Energy’s Motion to Dismiss for Lack of Subject Matter Jurisdiction Under 12(b)(1), see Doc. Nos. 13–14, fails to address personal jurisdiction and venue.  Consequently, Defendant CONSOL Energy has waived these affirmative defenses.

However, even if Defendant CONSOL Energy had not waived these defenses, personal jurisdiction would exist against it and this court would serve as a proper venue.  The Fourteenth Amendment’s Due Process Clause constrains this court’s authority to bind non-resident defendants to its judgment, see World-Wide Volkswagen

Corp. v. Woodson, 444 U.S. 286, 291 (1980), and requires that the non-residents retain "certain minimum contacts" with the forum State, International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The judicial inquiry into the "minimum contacts" required for creating specific jurisdiction focuses "on the relationship among the defendant, the forum, and the litigation." Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775 (1984).

That relationship between the defendant and the forum State must arise from contacts that the "defendant himself" creates with the forum, Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985), and must also be analyzed with respect to "the defendant's contacts with the forum itself, not with persons residing there." Walden v. Fiore, 134 S.Ct. 1115, 1122 (2014). In other words, "[t]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." Id. at 1122 (emphasis added); Burger King Corp., 471 U.S. at 475 ("Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum State.") (citations and internal quotation marks omitted). A court may properly assert jurisdiction based on a party's "purposeful[] avail[ment] . . . of the . . . benefits and protections" that the forum has offered. See Hanson v. Denckla,

357 U.S. 235, 253 (1958).  The "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts."  Burger King Corp., 471 U.S. at 475 (quoting Keeton, 465 U.S. at 774).

There is personal jurisdiction over Defendant CONSOL Energy in this court for the same reason that venue is proper here.  Defendant CONSOL Energy held meetings throughout this judicial district and the State of West Virginia soliciting retired miners' enrollment in its Health Reimbursement Account ("HRA") scheme.  Defendant CONSOL Energy purposefully availed itself of the benefits and protections of the State and this district.  This conferred personal jurisdiction upon Defendant CONSOL Energy.  See Hanson, 357 U.S. at 253. After all, Defendant CONSOL Energy sold the HRA scheme to the retired miners here.  Furthermore, Defendant CONSOL Energy and its predecessor corporations have a long history of involvement in the coal and natural gas industries in this district.

As for venue, the governing statute is 28 U.S.C. § 1391(b)(2) ("a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . ..").  Since, as the court already has established, it is here that Defendant CONSOL Energy sold the HRA scheme to the retired miners, venue is proper here.  The court deems it inappropriate to transfer this case to

the federal district court in the Western District of Pennsylvania,
and the motion to transfer is DENIED.

### B. There is No Personal Jurisdiction Over Defendants Helvetia, Island Creek, Laurel Run, and CONSOL Amonate

The court lacks personal jurisdiction over Defendants
Helvetia, Island Creek, Laurel Run, and CONSOL Amonate.

The court already has explained the prevailing law on personal
jurisdiction.  The court analyzes the facts against that backdrop.
Here, Defendants Helvetia, Island Creek, Laurel Run, and CONSOL
Amonate have no contacts with West Virginia, let alone this
judicial district, that might open them to suit in this case.  The
principal place of business for these Defendants is Canonsburg,
Pennsylvania, which is also Defendant CONSOL Energy's corporate
headquarters.  See Doc. No. 16.  Canonsburg, Pennsylvania,
therefore, would also be considered the Defendants' "nerve
center." Hertz Corp. v. Friend, 559 U.S. 77, 80 (2010).  While
some or all of these Defendants have conducted mining operations
in West Virginia in the past, they have long since ceased to do
so.

There is neither general nor specific jurisdiction over these
Defendants since they are not situated in West Virginia and they
have committed no substantial activities here that would open them
to being sued here.  They have not purposefully availed themselves
of the benefits here.  Thus, at best, the contacts between

10

Defendants Helvetia, Island Creek, Laurel Run, and CONSOL Amonate and the forum are "attenuated" for the purposes of the personal jurisdiction analysis.  <u>Keeton</u>, 465 U.S. at 774.

### (2)  DISCUSSION ON THE MERITS

#### A. Defendant CONSOL Energy

Defendant CONSOL Energy is the corporate parent.  Defendant CONSOL Energy claims that it is "a non-signatory to the expired 2011 NBCWA," and as such "has never agreed to arbitrate disputes under that Agreement."  Doc. No. 42.

The court finds that, in fact and deed, Defendant CONSOL Energy is the <u>agent</u> of Defendant subsidiaries, none of which have employees or other personnel to make any significant operational or administrative decisions or exercise control over the Employer Plan independent of Defendant CONSOL Energy.  It was Defendant CONSOL Energy, the court already has observed, that held meetings throughout this judicial district and the State of West Virginia soliciting retired miners' enrollment in its HRA scheme.  As such, the court concludes that Defendant CONSOL Energy is the real party in interest and is subject to the court's power to issue an injunction.

#### B. Interplay between the Labor Management Relations Act ("LMRA") and the Norris-LaGuardia Act ("NLGA")

Section 301 of the LMRA provides:

> Suits for violation of contracts between an
> employer and a labor organization

> representing employees in an industry
> affecting commerce as defined in this
> chapter, or between any such labor
> organizations, may be brought in any
> district court of the United States having
> jurisdiction of the parties, without respect
> to the amount in controversy or without
> regard to the citizenship of the parties.

29 U.S.C. § 185(a).  Despite Defendant CONSOL Energy's assertions in its Motion to Dismiss, see Doc. Nos. 13–14, that this court lacks jurisdiction over this case "because Defendant [CONSOL Energy] is not (and was never) signatory to a labor agreement with the Plaintiff," CONSOL Energy is signatory to a collective bargaining agreement at issue in this matter.  This is evidenced by CONSOL Energy's July 1, 2011 agreement to adopt the 2011 NBCWA Employer Plan, executed by Nicholas DeIuliis, who was then a top executive of CONSOL Energy.  See Doc. No. 8.  Defendant CONSOL Energy, and not its individual subsidiaries, administers the Employer Plan and benefits at issue in this matter.  Notably, CONSOL Energy, not any of its individual subsidiaries, has undertaken the conduct and has, to that end, even transmitted the salient correspondence (invariably on "CONSOL Energy, Inc." letterhead).  See id.  Defendant CONSOL Energy's conduct threatens to deprive Plaintiffs of a benefit guaranteed to them under the contract-based plan that Defendant CONSOL Energy manages.  As far as § 301 of the LMRA is concerned, this dispute arises "for violation of contracts between an employer and a labor organization

representing employees in an industry affecting commerce." Accordingly, the court may exercise subject matter jurisdiction, the anti-injunction stipulations of the NLGA notwithstanding.

The role of arbitration in labor disputes is important to recount; it goes to the power of this court to issue a preliminary injunction here. In Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 243 (1970), the United States Supreme Court held that "the importance of arbitration as an instrument of federal policy for resolving disputes between labor and management" means that the NLGA should not be construed to categorically prohibit injunctions preserving the status quo in labor disputes. "[T]he [NLGA] itself manifests a policy determination that arbitration should be encouraged." Id. at 242. Indeed, the United States Supreme Court has also observed that § 8 of the NLGA requires parties to make "'every reasonable effort' to settle the dispute by negotiation, mediation, or 'voluntary arbitration.'" Textile Workers v. Lincoln Mills, 353 U.S. 448, 458 (1957) (quoting 29 U.S.C. § 108).

The United States Court of Appeals for the Fourth Circuit reaffirmed the emphasis on encouraging arbitration in labor disputes in Lever Brothers Co. v. Int'l Chemical Workers Union, Local 217, 554 F.2d 115 (4th Cir. 1976). In Lever Brothers, the Fourth Circuit affirmed a district court's grant of a

preliminary injunction blocking an employer's decision to

transfer a facility from one state to another, thereby depriving

the workers of their jobs.  The Fourth Circuit held that

>           a plaintiff, without regard to whether he is
>           the employer or the union, seeking to
>           maintain the status quo pending arbitration
>           pursuant to the principles of Boys Markets
>           need only establish that the position he
>           will espouse in arbitration is sufficiently
>           sound to prevent the arbitration from being
>           a futile endeavor. If there is a genuine
>           dispute with respect to an arbitrable issue,
>           the barrier [to the issuance of an
>           injunction] we believe appropriate[ly] has
>           been cleared.

Id. at 120.  The Lever Brothers Court noted that such

injunctions may issue

>           where it is necessary to prevent conduct by
>           the party enjoined from rendering the
>           arbitral process a hollow formality in those
>           instances where, as here, the arbitral award
>           when rendered could not return the parties
>           substantially to the status quo ante.

Id. at 123.

     Later courts have followed Lever Brothers' policy of

promoting and encouraging arbitration of labor disputes.  They

grant preliminary relief in aid of arbitration where a plaintiff

demonstrates "[1] that he is likely to succeed on the merits,

[2] that he is likely to suffer irreparable harm in the absence

of preliminary relief, [3] that the balance of equities tips in

his favor, and [4] that an injunction is in the public

interest."  Real Truth About Obama, Inc. v. Fed. Election

Comm'n, 575 F.3d 342, 346 (4th Cir. 2009).  To be sure, "[a]
preliminary injunction is an extraordinary remedy, to be granted
only if the moving party clearly establishes entitlement to the
relief sought."  Manning v. Hunt, 119 F.3d 254, 263 (4th Cir.
1997) (emphasis added and internal quotation marks and
alteration omitted).[1]

    In the case of a preliminary, as opposed to a permanent
injunction, "[t]he evidentiary standard applied in determining
whether a plaintiff has established all four necessary elements
is substantially relaxed, given that the purpose of a
preliminary injunction is merely to preserve the relative
positions of the parties until a trial on the merits can be
held."  Marietta Memorial Hospital, et. al v. West Virginia
Health Care Auth., 2016 WL 7363052 (S.D.W. Va. December 19,
2016) (citing Univ. of Texas v. Camenisch, 451 U.S. 390, 395
(1981)).

    Lever Brothers provides that injunctive relief should issue
to preserve the status quo if the "hollow formality" standard

---

[1] The movant must meet each of these factors in order to
obtain a preliminary injunction.  However, satisfying these
factors will not automatically guarantee an injunction.  In
particular, "'[i]n exercising their sound discretion, courts of
equity should pay particular regard for the public consequences
in employing the extraordinary remedy of injunction.'"  Winter
v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)
(quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312
(1982)).

and ordinary principles of equity are satisfied and, consequently, the Boys Markets exception to the anti-injunction provisions of the NLGA applies.  Nursing H. & Hosp. Union v. Sky Vue Terrace, 759 F.2d 1094, 1098 (3d Cir. 1985).  Termination of Plaintiffs' group health insurance benefits is likely to cause harm that cannot be remedied by the arbitrator, threatening to make arbitration but a "hollow formality."  Id.  The "hollow formality" test, id., is identical to the judicial inquiry whether the party seeking the injunction will be irreparably harmed without this relief.  See Oil, Chem. & Atomic Workers Int'l Union v. Amoco Oil Co., 885 F.2d 697, 704 (10th Cir. 1989); Aluminum Workers Int'l Union v. Consolidated Aluminum Corp., 696 F.2d 437, 443 (6th Cir. 1982); Int'l Ass'n of Machinists & Aerospace Workers v. Panoramic Corp., 668 F.2d 276, 286 (7th Cir. 1981).

Boys Markets injunctions under § 301 of the LMRA are forward-looking.  The United States Supreme Court in Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW, 523 U.S. 653 (1998), did not suggest that courts are powerless under the Boys Markets line of precedent to enjoin future conduct that threatens to undermine the arbitral process.  Just recently, a sister court within our own Circuit enjoined an employer's future conduct to preserve the arbitral process.  See Int'l Brotherhood of Teamsters, Local Union No. 639 v. Airgas, Inc.,

Civ No. 17-cv-00577, Doc. No. 19 (D. Md. March 3, 2017)
(enjoining future "relocation of the operations to other plants
and the loss of 13 Union positions . . . [because it] cannot, as
a practical matter, be fully unwound."). Moreover, prosecuting
an action to compel arbitration would be clearly inadequate to
preserve the status quo pending an arbitration decision; and
judicial intervention is unnecessary to compel the ROD's
arbitration since an arbitral decision on the dispute will issue
irrespective of Defendants' participation.

Plaintiffs' pre-expiration ROD requesting an order from the
Trustees addressing pre-and post-expiration communications
unjustifiably threatening termination of the Employer Plan is
arbitrable and the Trustees are processing it. Even if the ROD
had been filed following expiration of the NBCWA or concerned
exclusively post-expiration conduct, it is settled law that ROD
disputes addressing benefits that survive the expiration of a
labor agreement remain arbitrable after the agreement's
expiration. See Litton Financial Printing Div. v. NLRB, 501
U.S. 190 (1991); Cumberland Typographical Union No. 244 v. Times
and Alleganian Co., 943 F.2d 401, 404 (4th Cir. 1991).

Defendant may be estopped from claiming Plaintiffs' vested
right to benefits and access to the ROD process terminate upon
expiration. Judicial constructions accorded labor contract
terms carry over to subsequent labor contracts, unless the

parties choose to alter the same.  See Carbon Fuel Co. v. UMWA,
444 U.S. 212, 222 (1979).  Importantly, this court already has
interpreted the language contained in the NBCWA and Employer
Plan as creating a vested lifetime right to the Employer Plan
benefits; and post-expiration access to the ROD process did not
change in subsequent negotiations with Defendant CONSOL Energy.
See Parsons v. Power Mtn. Coal Co., 2009 WL 899457 (S.D.W. Va.
Mar. 31, 2009), aff'd, 604 F.3d 177, 178 (4th Cir. 2010).  In
fact, "the type of benefits at issue here are vested benefits,
the right to which extends beyond the termination of the
contract."  Id. at *6; see also Lewis v. Howell, No. 5:05-0525
(S.D.W. Va. Apr. 7, 2006) (Faber, J.); UMWA v. Falcon Energy,
Inc., No. 1:99-0388 (S.D.W. Va. Mar. 19, 2002) (Faber, J.); UMWA
v. BethEnergy Mines, Inc., No. 2:99-0738, 2001 U.S. Dist. LEXIS
6242 (S.D.W. Va. Mar. 19, 2001) (Goodwin, J.); District 29, UMWA
v. Royal Coal Co., No. 5:85-0292, 1987 U.S. Dist. LEXIS 14578
(S.D.W. Va. Jan. 5, 1987) (Knapp, J.).  Here, as in the Parsons
case, the "retirement health benefits [of some of the retirees]
vested prior to the expiration of the [2011 NBCWA and Employer
Plan]."  2009 WL 899457, *6.  In any event, the 2011 NBCWA was
executed and the Employer Plan adopted.  "If these
interpretations" the courts have given to the labor-contract
terms "did not accord with the parties' understanding of their
contract, they had ample opportunity to make their own

understanding explicit.  Failure to do so strongly suggests the parties incorporated the courts' interpretation of the agreement."  Tr. at 222.

Additionally, with respect to Litton, an explicit agreement to arbitrate post-expiration disputes is only one of several circumstances in which courts find post-expiration disputes arbitrable:

> [A] post expiration grievance can be said to arise under the contract only [1] where it involves facts and occurrences that arose before expiration, [2] where an action taken after expiration infringes on a right that accrued or vested under the agreement, [3] or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

Parsons, 2009 WL 899457 at *7 (internal citations and quotation marks omitted).

The nature of the harm at issue in this case is of critical importance.  Defendants are threatening to terminate employer plan group insurance benefits and if they succeed, then retirees may be left without health coverage.  In light of the Lever Brothers analysis, it suffices for Plaintiffs to show that in the absence of an injunction preserving the status quo, the company's conduct is likely to harm the arbitral process itself. This would harm the arbitral process.  In addition, an arbitrator is not likely to be able to remedy the termination of

retiree health insurance that threatens harm, and such

terminations should be preliminary enjoined.  Courts assess such

harm against a background of generally known facts, including

> (1) most retired union members are not rich,
> (2) most live on fixed incomes, (3) many
> will get sick and need medical care, (4)
> medical care is expensive, (5) medical
> insurance is, therefore, a necessity and (6)
> some retired workers may find it difficult
> to obtain insurance on their own while
> others can pay for it only out of money that
> they need for other necessities of life. We
> should then conclude that retired workers
> would likely suffer emotional distress,
> concern about potential financial disaster,
> and possibly deprivation of life's
> necessities (in order to keep up insurance
> payments).

Textron, 836 F.2d at 8.  Analyzed in this light, the record

evidence clearly shows a likelihood of irreparable harm to the

members of Plaintiff union.

First, Defendant has threatened to terminate the HRA Scheme

"at any time, for any reason."  Doc. No. 9.  Defendant

frequently has stated that it reserves the right to terminate or

modify the replacement HRA scheme "at any time, for any reason,"

id., and that "'CONSOL Energy makes no representation or

warranty regarding the adequacy of your HRA to cover all of your

health care expenses now or in the future.'"  Doc. No. 9

(quoting Decl. of B. Sanson at ¶21—22; Exhibits Y and Z).

Second, in this case the arbitral process itself appears to

be threatened by a decision on the merits from a different

forum.  The Fourth Circuit has held that the harm caused when an arbitration is allowed to proceed but the decision later is vacated is insignificant compared to the "irreparable harm that exists when arbitration is denied ab initio, or when an injunction [staying judicial proceedings on the merits of an arbitral dispute pending arbitration] is denied." Taylor v. Nelson, 788 F.2d 220, 224 (4th Cir. 1986) (emphasis added).  In a more recent case, Judge Chambers found irreparable harm to the negotiated benefit of an arbitration agreement where one party to that agreement sought resolution of a covered dispute in another forum.  See GMRI, Inc. v. Garrett, 2014 WL 1351126 (S.D.W. Va. April 4, 2014).  In Garrett, the court enjoined the West Virginia Human Rights Commission from adjudicating an individual employment dispute and compelled its arbitration; the court reasoned that any other course of action "would . . . deprive[]" the employer "of the benefits of its arbitration agreement" with the employee who sought relief at the Commission.  Id. at *4.

A decision on the merits from any forum other than the ROD process would undermine the bargained-for benefit of that process, through which the Trustees would be able to secure expert review of full information about the company's plan, including an assessment of specialty drug coverage, see Tr. 184, and creation of a disruption report, see Tr. 180.  Furthermore,

unlike the courts, the Trustees are directed to ensure consistent interpretation of individual signatory companies' Employer Plans.  See Parsons at *12 (recognizing the "stated goal" in the NBCWA "that the Employer Plans be administered consistently . . .").

Defendants seem to want a non-arbitral decision as to their NBCWA and Employer obligations in another forum.  See Helvetia Coal Co. et al v. United Mine Workers of America, Int'l Union, Case No. 17-00002 (filed Jan 2, 2017 W.D. Pa.).  They have only threatened even greater harms since in a January 12, 2017 letter to beneficiaries, they appear to have repudiated their prior agreement to resolve disputes through the ROD process and have purported to limit the forum for resolution of health benefit disputes to the Western District of Pennsylvania.  See Pls.' Ex. 32.  The possibility that Defendants would succeed in their effort to obtain a non-arbitral decision on the merits of the ROD dispute threatens real and imminent harm.

Third, come April 1, 2017, some of the most vulnerable retirees likely would lose insurance coverage altogether.  Several retirees would lose the bargained-for benefit of comprehensive coverage for all Food and Drug Administration ("FDA")-approved prescription drugs as they are forced into a drug plan that does not cover all FDA-approved drugs.  See Tr. 182-84.

The group health insurance benefits under which the Employer bears all risk would be lost.  Under the benefits plan, all FDA-approved drugs are covered and disputes are resolved through a negotiated process.  This too would be lost. Moreover, the most vulnerable beneficiaries would likely lose health insurance coverage altogether. Those incapacitated by old age or common diseases would be left completely without insurance coverage as of April 1, 2017, if they predictably are unable to take the affirmative step of enrolling in their own individual insurance plan.

Fourth, on April 1, 2017, the retirees would be encumbered with novel administrative burdens and risk.  Courts addressing employers' similar attempts to unilaterally terminate group health insurance and substitute an HRA scheme have recognized the considerable burdens shifted from employer to retired beneficiary.  In United Steel Workers v. Kelsey-Hayes Co., 2016 WL 337467, at *2 (E.D. Mich. Jan. 28, 2016), the court upheld its prior injunction in a case where the employer terminated group health insurance for retirees and substituted an HRA scheme.  This action led Plaintiffs to allege: "the change to HRAs meant that retirees bore the administrative and financial risks and responsibilities formerly borne by Defendants [and] . . . the HRA program subjected them to time-consuming and frustrating administrative burdens, anxiety, and uncertainty."

Id. at *2; see also United Steel Workers v. Resolute Forest Products, Inc., 1:16-CV-00048, Doc. No. 42 (E.D. Teen. Mar. 1, 2017) (denying motion to dismiss Plaintiffs' complaint that the employer "replaced these [group insurance] health care benefits with 'limited funds' provided through a Health Reimbursement Account.").

The same administrative burdens and risk shifting threaten harm to Employer Plan beneficiaries in this case.  Starting April 1, 2017, the retiree beneficiaries would be encumbered with new administrative burdens and risks that Defendant CONSOL Energy had agreed in the NBCWA and Employer Plan to carry for their lifetimes.  Even if the HRAs do ultimately end up paying, Defendant CONSOL Energy has yet to implement a scheme to protect retirees from having to first pay out-of-pocket, and then wait for reimbursement.  See Tr. 165.  Consequently, Plaintiffs will be irreparably harmed were this court to refuse to preserve the status quo with a preliminary injunction.

## C. The Rest of the Preliminary Injunction Inquiry is Satisfied

The court has concluded as set out above that members of Plaintiff union will suffer irreparable harm in the absence of an injunction.  The remaining three considerations of the analysis also are in Plaintiffs' favor.  Because of the policy favoring arbitration in labor disputes and the long-standing obligation of coal companies to provide medical care for UMWA

24

members, Plaintiffs are likely to succeed on the merits.  The balance of equities clearly tips in favor of Plaintiffs.  In the absence of an injunction, medical benefits may be lost.  Defendant CONSOL Energy, should it ultimately prevail, and be deemed entitled to cancel or change benefits, can still do so after the matter is concluded.  Because of the public policy favoring injunctions in such cases and the desire throughout society to provide medical benefits for the sick and the injured, an injunction is in the public interest.

*        *        *

Plaintiffs' Motion for a Preliminary Injunction, see Doc. No. 8, is **GRANTED;** Defendants' Motion to Dismiss, see Doc. No. 41, is **GRANTED in part** to this effect: Defendants Helvetia Coal Company Helvetia, Island Creek Coal Company, Laurel Run Mining Company, and CONSOL Amonate Facility, LLC, are dismissed; Defendants' Motion to Transfer this case to the Western District of Pennsylvania is **DENIED**; and a Preliminary Injunction Order of even date with this Opinion will be entered.

The Clerk is **DIRECTED** to forward a copy of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED** this 17th day of March, 2017.

ENTER:

David A.  Faber
Senior United States District Judge