**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

INTERNATIONAL UNION, UNITED
MINE WORKERS OF AMERICA, et al.,

*Plaintiffs*,

v.

CONSOL ENERGY INC., et al.,

*Defendants*.

Civil Action No. 1:20-cv-01475 (CJN)

**MEMORANDUM OPINION**

In June 2020, the Southern District of West Virginia transferred two consolidated cases to this District.  *See* Mem. Op. and Order ("Transfer Op."), ECF No. 119.  In the first, International Union, United Mine Workers of America sought to enforce a 2017 arbitration award in its favor. *See generally* 2d Am. Compl., ECF No. 78.  In the second, former subsidiaries of a company formerly known as CONSOL (now CNX Resources Corporation) sought to vacate the arbitration award.  *See generally Helvetia Coal Co. v. United Mine Workers of Am., Int'l Union*, No. 1:20-cv-01476, Am. Compl., ECF No. 25.  Once the cases were transferred here, the Court permitted the Union to amend its own complaint for a third time to add the former subsidiaries as defendants (in addition to CNX), and in the case brought by the subsidiaries, allowed the Union to counterclaim to compel enforcement of the award.  *See* Mem. Op. and Order, ECF No. 144, 145.

Pending before the Court are several motions.  The Union moves for summary judgment, seeking to enforce the arbitration award against CNX and the former subsidiaries and to reject the subsidiaries' claims seeking to vacate the award.  *See* Pls.'s Mot. for Summ. J., ECF No. 153; Pls.'s Mem. in Opp'n to Defs.'s Cross-Mot. for Summ. J., ECF No. 158; Defs.'s Answer to 3d

Am. Compl. ("Defs.'s Answer"), ECF No. 149 at 20.  The subsidiaries seek to vacate the award, contending that the arbitration panel exceeded its authority under the plain language of the bargaining agreement, such that the award should be vacated and not enforced.  *See* Defs.'s Cross-Mot. for Summ. J., ECF No. 155; Pl.'s Mem. in Opp'n to Defs.'s Cross-Mot. for Summ. J., ECF No. 158; Defs.'s Answer at 20.  And CNX moves to dismiss for lack of jurisdiction, arguing that the Union has failed to plead a cognizable, actual controversy against it.  *See* Def.'s Mot. to Dismiss, ECF No. 154.  After hearing argument on the motions and for the reasons explained below, the Court grants CNX's motion to dismiss for lack of jurisdiction and denies the cross-motions for summary judgment, pending the additional briefing ordered below.

## I.  Background

International Union, United Mine Workers of America (the Union for short) and a multiemployer bargaining association called the Bituminous Coal Operators' Association, which acts on behalf of member employers, came to terms on a collective bargaining agreement in the summer of 2011.  Defs.'s Answer, ECF No. 151 at ¶ 10.  By its express terms, the bargaining agreement would expire at the end of 2016.  *Id.*  The bargaining agreement governed the terms and conditions of employment for the Union-represented miners who work or had worked for signatory employers.  *See* Transfer Op. at 2–3.  It also includes several specific provisions pertinent to this case.

The first set of relevant provisions committed each signatory to provide health care benefits to plan participants and retirees.  Article XX(c)(3)(i) states in relevant part:

"Each signatory Employer shall establish and maintain an Employee benefit plan to provide . . . health and other non-pension benefits for its Employees covered by this agreement  . . . .  The benefits provided by the Employer to its eligible participants pursuant to such plan shall be guaranteed during the term of this Agreement at levels set forth in such plan. The plans established pursuant to this subsection are incorporated by reference and made a part of this Agreement, and

the terms and conditions under which the health and other non-pension benefits will be provided under such plans are as to be set forth in such plans." *See* The CBA, ECF No. 1-1 at 18.

The second set of provisions establish the arbitration panel's jurisdiction to entertain disputes arising under the bargaining agreement. The Parties refer to this as the Resolution of Disputes (or ROD) process. Article XX(e)(5) provides in part that:

> "Disputes arising out of this Agreement with regard to the Employer benefit plan established in (c)(3) above shall be referred to the Trustees. The Trustees shall develop procedures for the resolution of such disputes. In the event the trustees decide such dispute, such decision of the Trustees shall be final and binding on the parties." *Id.* at 36.

An explanatory note found in Article XX Section 10 adds that:

> "The Trustees of the UMWA Health and Retirement Funds shall resolve any disputes . . . to assure consistent application of the health plan provisions in the Employer Benefit Plans and of the managed care programs authorized by this Agreement." *Id.* at 76.

And Article XX Section (e)(5) states that:

> "The Trustees shall develop procedures for the resolution of such disputes. In the event the trustees decide such dispute, such decision of the Trustees shall be final and binding on the parties." *Id.* at 35.

The third set of provisions provide the process for changing health benefits under the plans.

Article XX Section (c) provides that:

> "The benefits and benefit levels provided by the Employer under its Employer Plan are established for the term of this Agreement only, and may be jointly amended or modified in any manner at any time after the expiration or termination of this Agreement." *Id.* at 43.

The coal industry came under severe financial pressure soon after the bargaining agreement took effect. As a result of the dire economic situation, CONSOL initiated a comprehensive-cost-reduction initiative. *See* Defs.'s Statement of Undisputed Material Facts ("Defs.'s SUMF"), ECF No. 155-1 at ¶ 25. In 2016, CONSOL, speaking on behalf of signatory subsidiaries (including the

signatories that are parties in this case), met with Union officials to discuss potential changes to the health benefit plans.  *Id.* ¶ 28.  CONSOL and the subsidiaries proposed "transitioning the approximately 2,000 Medicare-eligible retirees and dependents to individualized Medicare Supplement plans whose premiums would be paid from Health Reimbursement Accounts."  *Id.* ¶ 29.

Later in 2016, CONSOL sent a letter to Union retirees referencing the initiation of benefit discussions with the Union.  *Id.* ¶ 32.  The letter stated that CONSOL and the subsidiaries had "initiated discussions with the [Union] regarding new options for providing healthcare benefits," and promised that "[i]n all events, we will continue to communicate with you in the coming months about this very important matter before any changes are implemented."  Compl., ECF No. 1-2 at 2.  In a follow-up letter sent a couple months later, CONSOL stated that "changes to the healthcare programs provided by CONSOL's subsidiaries under the [agreement]" were under consideration given the dire economic circumstances the coal industry found itself in.  Compl., ECF No. 1-3 at 1.  The letter added that CONSOL and the subsidiaries had "recently provided a proposal to [Union] leadership that details such a plan, and we look forward to discussing these options with them so that we can continue to provide access to quality healthcare despite the harsh realities that confront our industry."  *Id.* at 2.

Soon after receiving the second letter, Richard Fink, a retired coal miner and a participant in the subsidiaries' health plan, submitted to the arbitration panel, with the aid of the Union, ROD No. 11-0143.  *See* Defs.'s SUMF ¶¶ 42, 44.  Fink's ROD stated: "CONSOL sent a letter to its [] retirees reflecting its intention to modify their benefits upon the termination of the 2011" bargaining agreement.  *See* Fink's ROD, ECF No. 147-2 at 2.  The letter also noted that the bargaining agreement provided that post-termination modifications of benefits "may only be

implemented by agreement with the" Union.  *Id.*  And it requested an order from the arbitration panel forcing CONSOL to "notify its retirees that it cannot make any changes in their benefits without the agreement of the [Union]."  *Id.*

The arbitration panel issued its decision roughly a year later.  *See* Op. for ROD No. 11-0143, ECF No. 147-1 at 2.  The panel first concluded that it possessed jurisdiction over the ROD because "it involves a dispute arising under the [bargaining agreement] and a dispute that concerns provisions of the [agreement] that apply after [its] expiration."  *Id.* at 7.  It next decided that neither CONSOL nor the subsidiaries could "make [] changes unilaterally" to the retirees' health plans.  *Id.* at 9.  Instead, "any modification or changes [] must be made only upon joint agreement."  *Id.* at 11.  The panel acknowledged that no employer had made changes to any plan.  *Id.*  Yet it concluded that the proposed changes described in the letter would "not provide the level of health benefits as mandated in the 2011 [agreement]."  *Id.*

Soon after the panel released its decision, CONSOL spun-off its coal business, cutting ties with many of its subsidiaries, to form a new publicly traded company.  *See* Defs.'s SUMF ¶ 57. Under the name CNX, the newly formed company concentrates on oil and gas exploration, development, and distribution rather than on coal excavation.  *Id.* ¶ 58.  CNX has never employed Union-represented-coal miners, has never made contributions to any retirees' health benefit plan, and has never served as an administrator of any health plan.  *Id.* ¶¶ 58–62.

In late October 2017, the Union sought to confirm the arbitration award in a pending lawsuit filed in the Southern District of West Virginia.  *See* Transfer Op. at 6–10.  The subsidiaries responded to the arbitration decision in two ways:  first, they moved to dismiss the Union's Second Amended Complaint for lack of jurisdiction, *See* Subsidiaries' Mot. to Dismiss Pls.' 2d Am. Compl., ECF No. 98; and second, they filed a lawsuit in the Western District of Pennsylvania to

vacate the arbitration award, *Helvetia Coal Co. v. United Mine Workers of Am., Int'l Union*, No. 1:20-cv-01476, Compl., ECF No. 1.  The Western District of Pennsylvania transferred the action seeking vacatur to the Southern District of West Virginia, which consolidated the cases, *see* Transfer Op. at 55–57; declined to exercise personal jurisdiction over the subsidiaries, *id.* at 47–49; and transferred the consolidated cases to this District, *id.* at 59–63.

With discovery complete, and after the Court permitted the Union to amend its complaint a third time, the Parties filed various dispositive motions.  The Union seeks to enforce the arbitration award against CNX and the subsidiaries.  *See* Pls.'s Mot. for Summ. J., ECF No. 153. The subsidiaries seek to vacate the award, contending the arbitration panel exceeded its authority under the plain language of the bargaining agreement.  *See* Defs.'s Cross Mot. for Summ. J., ECF No. 155; Pls.'s Mem. in Opp'n to Defs.'s Cross-Mot. for Summ. J., ECF No. 158; Defs.'s Answer at 20.  And CNX moves to dismiss for lack of jurisdiction, arguing that the Union has failed to plead a cognizable, actual controversy against it.  *See* Defs.'s Mot. to Dismiss, ECF No. 154.

## II.    The Arbitrability of the Fink ROD

For over half a century, the Supreme Court has "applied a very deferential standard for judicial review of labor arbitration decisions." *Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union*, 589 F.3d 437, 441 (D.C. Cir. 2009) (Kavanaugh, J.).  "In 1960, the Supreme Court issued three decisions designed to end the federal courts' hostility to labor-arbitration awards." *Michigan Fam. Res., Inc. v. Serv. Emps. Int'l Union Loc. 517M*, 475 F.3d 746, 750 (6th Cir. 2007).

In what is known today as the *Steelworkers Trilogy*, the Supreme Court established ground rules for the review of arbitration awards.[1]  Two of those ground rules are relevant here.[2]

First, courts rather than arbitrators determine whether a collective bargaining agreement requires that a dispute be resolved through arbitration.  *See United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960).  That rule governs because arbitration "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *Livadas v. Bradshaw*, 512 U.S. 107, 124 n.17 (1994) (quotation omitted).  An arbitration panel therefore has "authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986).[3]

Second, where the bargaining agreement provides that a dispute should be submitted to arbitration, the courts have very limited authority in reviewing the merits of a particular dispute.  *See United Steelworkers of America v. American Mfg. Co.*, 353 U.S. 564 (1960).  To do so would usurp the role of the arbitrators.  That principle holds true even in face of "allegations that the

---

[1] Courts have recognized that ROD opinions count as arbitration awards in circumstances similar to the one at hand.  *See Parsons v. Power Mountain Coal Co.*, 604 F.3d 177, 181 (4th Cir. 2010) (Wilkinson, J.) ("This court has previously recognized that ROD opinions, issued under the authority of the NBCWAs, are arbitration awards.").

[2] The subsidiaries challenge an arbitration decision.  As such, the Federal Arbitration Act governs this case.  *See* 9 U.S.C. § 2; *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001).  The FAA authorizes a court to vacate an arbitration panel's decision only in narrow circumstances.  *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995); *Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1178 (D.C. Cir. 1991) ("Courts have recognized that judicial review of arbitral awards is extremely limited.").  This case also involves a collective bargaining agreement, which means that the Labor Management Relations Act of 1947 governs the dispute too.  *See* 29 U.S.C. §§ 185, et seq.  The subsidiaries appear to have conceded that the Court has statutory jurisdiction under the LMRA to entertain this case.  *See* Defs.'s Mem. in Opp'n to Sum. J., ECF No. 159 at 7 ("The [Union] may invoke § 301 of the LMRA as a jurisdictional basis for bringing an action in federal court challenging whether changes to the manner in which the signatory Defendants provide benefits to their retirees post-expiration violates the terms of the expired 2011 Agreement.").  Indeed, the subsidiaries confirmed the concession at the hearing held for this matter.  *See* Minute Order September 13, 2021.

[3] A court will defer to an arbitrator's decision about whether the parties had to arbitrate a particular grievance only where the collective bargaining agreement "clearly and unmistakably" grants the arbitrator the authority to make that call.  *KenAmerican Resources, Inc. v. Int'l Union, United Mine Workers of Am.*, 99 F.3d 1161, 1163 (D.C. Cir. 1996).  The collective bargaining agreement in this case does not clearly and unmistakably do so here, and the Union does not contend otherwise.

[arbitration] decision rests on factual errors or misinterprets the parties' agreement." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam).  A court will therefore uphold an arbitration decision so long as it "draws its essence from the collective bargaining agreement." *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).  A decision draws its essence from the bargaining agreement when the arbitrator was "even arguably construing or applying the contract and acting within the scope of his authority." *Garvey*, 532 U.S. at 509 (quotation omitted); *Nat'l Postal Mail Handlers Union*, 589 F.3d at 441 (Kavanaugh, J.) (holding that a decision draws its essence from the bargaining agreement if the "arbitrator premised his award on his construction of the contract") (quotation omitted).  An arbitration award does not draw its essence from the contract when the arbitrators dispense their "own brand of industrial justice" rather than apply the provisions of the bargaining agreement. *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).  An "arbitration award that fails to draw its essence from the collective bargaining agreement cannot stand." *Madison Hotel v. Hotel & Rest. Employees, Local 25, AFL-CIO*, 144 F.3d 855, 858 (D.C. Cir. 1998).

The arbitration panel not only possessed the authority to arbitrate the Fink ROD, but it also rendered a decision that drew its essence from the collective bargaining agreement.

Recall that Article XX(c)(3)(i) of the bargaining agreement placed an obligation on the signatory employers to provide health care benefits to plan participants: "Each signatory Employer shall establish and maintain an Employee benefit plan to provide . . . health and other non-pension benefits for its Employees covered by this agreement." *See* The CBA, ECF No. 1-1 at 18.  Recall, too, that Article XX Section (c) prohibited the signatory employers from unilaterally changing benefits:  "The benefits and benefit levels . . . may be jointly amended or modified in any manner

at any time after the expiration or termination of this Agreement." *Id.* at 43.  And recall that Article XX Section (e) committed all disputes arising under the health plans to an arbitration panel for final and binding determination:  "Disputes arising out of this Agreement . . . shall be referred to the [arbitration panel, which] shall develop procedures for the resolution of such disputes.  In the event the [panel] decide[s] such dispute, such decision . . . shall be final and binding on the parties." *Id.* at 36.

Those provisions, taken together, show that the arbitration panel had the authority to arbitrate this dispute.  Though the Court does not defer to the arbitration panel's determination that it could arbitrate the matter, the panel's explanation goes a long way toward confirming the panel's authority to arbitrate the Fink ROD.[4]

Relying on the text of the bargaining agreement, the panel determined that it had jurisdiction because the ROD "involves a dispute arising under the [bargaining agreement] and a dispute that concerns provisions of the [bargaining agreement] that apply after [its] expiration." *See* Op. for ROD No. 11-0143, ECF 147-1 at 7.  The panel also concluded that "a dispute over post-expiration changes to [health benefit levels] is subject to ROD jurisdiction because the dispute arises under the [bargaining agreement] and concerns a provision of the [health benefit plan] that addresses the procedure by which benefits and benefit levels may be modified after contract expiration." *Id.* at 8.  And the arbitration panel's ruling notes that the plain language of bargaining agreement reserves "disputes" and "any disputes" arising under to the arbitration panel for

---

[4] Where "a party to an arbitration proceeding challenges the arbitrator's authority to decide a particular issue, the "threshold question of arbitrability is one of law, and a reviewing court is obligated to make its own determination of the issue." *Davis v. Chevy Chase Fin. Ltd.*, 667 F.2d 160, 166–67 (D.C. Cir. 1981); *Solvay Pharms., Inc. v. Duramed Pharms., Inc.*, 442 F.3d 471, 477 (6th Cir. 2006).  A court's "decision may, of course, be informed by the arbitrator's resolution of the arbitrability question," and "where the scope of arbitration is fairly debatable or reasonably in doubt, the arbitrator's assumption of jurisdiction should be upheld." *Davis*, 667 F.2d at 167 (quotation omitted).

resolution.  The Court, like the panel, concludes that the subsidiaries and the plan participants agreed to arbitrate the dispute at issue in this case.

Having concluded that the panel had the authority to decide the Fink ROD, the Court also holds that its decision drew its essence from the bargaining agreement.  In other words, this is not a case where the panel's "words reveal that [it] has gone beyond interpreting and applying the parties' agreement."  *See Preeminent Protective Servs., Inc. v. Serv. Employees Int'l Union, Local 32BJ*, 330 F. Supp. 3d 505, 512 (D.D.C. 2018) (quoting *Hay Adams Hotel LLC v. Hotel & Rest. Emps., Local 25, Unite Here Int'l Union*, No. 06-968, 2007 WL 1378490, at *5 (D.D.C. May 9, 2007)).  This case, at the very least, presents a situation where the award "stemmed from a colorable interpretation of the parties' [agreement]," which means that the panel drew the "essence" of its decision from the agreement.  *Commc'ns Workers of Am., AFL-CIO v. Sw. Bell Tel. Co.*, 953 F.3d 822, 830 (5th Cir. 2020).

The arbitration panel articulated its review of the background facts, including arguments for and against arbitration.  *See* Op. for ROD No. 11-0143, ECF 147-1.  It then considered the pertinent provisions of the bargaining agreement with respect to the substantive dispute.  *Id.*  And it engaged in a considerable exposition of the proposed changes and how the proposed changes would affect the health benefit levels of plan participants.  *Id.*  All that, considered together, leads to the conclusion that the decision drew its essence from the bargaining agreement.

The subsidiaries challenge this conclusion by arguing that the ROD process exists for individual plan participants to adjudicate disputes about a denial of benefits rather than for claims for prospective relief made by numerous participants.  To put it differently, the subsidiaries argue that the ROD procedure establishes nothing other than an abbreviated, second-level review of benefit denial disputes between employees and retirees and their employer.  The process was not,

according to the subsidiaries, created to address hypothetical disputes or to resolve collective bargaining disputes between the Union and the employers, which means that the employers never agreed to arbitrate the Fink ROD.  Yet the broad language of the bargaining agreement, together with past practice, foreclose the subsidiaries' challenge.

That language is broad and general does not mean that it is ambiguous.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *see Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 557 (9th Cir. 2016) ("[A] word or phrase is not ambiguous just because it has a broad general meaning.").  Here, the plain language of the bargaining agreement reserves "disputes" and "any disputes" arising under the agreement with respect to health benefit plans to the arbitration panel for resolution.  The language does not make reference to the subsidiaries' perceived limitation of the ROD process to a single claimant at a time, or to the arbitration panel not deciding forward-looking questions.  Rather, the broad references found in the bargaining agreement create space for plan participants to utilize the ROD process to dispute the signatory employers' stated intent to modify or terminate the health benefit plans.

Past practice also supports the decision to arbitrate.  In particular, the Union has pointed to past examples in which the panel decided disputes implicating groups of employees rather just a single employee who has been denied a benefit.  Consider ROD No. 84-523, which involved multiple employees raising a grievance before the arbitration panel.  Def.'s Mem. in Opp'n to Pls.'s Mot. for Summ. J., ECF No. 158-2, Ex. 1A.  Other examples exist, too.  *See id.* at Ex 1B; *see also id.* at Ex. 1C.  The availability of the ROD procedure to groups of employees to enforce their collective right to health benefits furthers the ROD mechanism's fundamental purpose of ensuring that the panel's determinations have consistent and broad application.

The subsidiaries also contend that, following expiration of the bargaining agreement, their only extant contractual obligation was to provide post-expiration health benefits to eligible participants.  As the employers see it, nothing in the expired agreement required the companies to retain the ROD procedures after its expiration, which means that the Fink ROD decision cannot draw its essence from the agreement because the panel read into the expired agreement an obligation to submit to the panel's authority.

The Supreme Court has made clear that even absent an explicit agreement certain grievance procedures continue post-expiration:  "a post expiration grievance can be said to arise under the contract only where it involves facts and occurrences that arise before expiration, where a post expiration action infringes a right that accrued or vested under the agreement, or where, under the normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement."  *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 206 (1991); *Int'l Bhd. of Elec. Workers, Loc. 1200 v. Detroit Free Press, Inc.*, 748 F.3d 355, 358 (D.C. Cir. 2014).  And in cases where the "collective-bargaining agreement provides in explicit terms that certain benefits continue after the agreement's expiration, disputes as to such continuing benefits may be found to arise under the agreement, and so become subject to the contract's arbitration provisions."  *Litton*, 501 U.S. at 207–08; *Detroit Typographical Union v. Detroit Newspaper Agency*, 283 F.3d 779, 787 (6th Cir. 2002).  Whether a post-expiration grievance procedure survives expiration is therefore "like so much else in this area, a matter of basic contract law," making the key question "whether the parties agreed to arbitrate this dispute." *United Steel, Paper And Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO/CLC, Loc. No. 850L v. Cont'l Tire N. Am., Inc.*, 568 F.3d 158, 164 (4th Cir. 2009) (Wilkinson, J.).

The bargaining agreement states in broad terms that: "Disputes arising under this Agreement . . . shall be referred to the [arbitration panel] . . . . [And that] [p]recedent under the resolution of disputes mechanism previously in place shall remain in effect, and the panel shall be required to cooperate to assure the consistent interpretation of provisions under the Employer Plans under this Article." *See* The CBA, ECF No. 1-1 at 36.  And Article XX Section (c) provides that: "The benefits and benefit levels . . . may be jointly amended or modified in any manner at any time after the expiration or termination of this Agreement." *Id.* at 43.  That language, taken together, indicates that a dispute such as Fink's ROD may be arbitrated post-expiration.  *United Parcel Serv., Inc. v. Union De Tronquistas De Puerto Rico, Loc. 901*, 426 F.3d 470, 474 (1st Cir. 2005) ("We find no evidence in these provisions—clear or otherwise—that the parties agreed to depart from the presumption that matters arising under a particular collective bargaining agreement will remain arbitrable even after the contract has terminated.").  The arbitration panel also relied on precedent under the resolution of dispute mechanism, including examples of the arbitration panel asserting ROD jurisdiction after the expiration of a bargaining agreement in the 1980s.  *See* Op. for ROD No. 11-0143, ECF No. 147-1 at 8.  And the bargaining agreement specifies that health benefits would survive expiration.  *See* The CBA, ECF No. 1-1 at 18, 43.

The Court therefore will not vacate the arbitration award.  *See Parsons*, 604 F.3d at 178 ("Lest we risk the disruption of the carefully negotiated rules governing labor-management relations within the coal industry, we decline to second-guess the judgment of arbitrators interpreting a complicated collective bargaining scheme comprised of interwoven agreements.").

### III.   Article III Standing as to CNX

As a result of the corporate spinoff and having no authority over the future of any health benefit plan, CNX contends that the Court lacks subject-matter jurisdiction over claims against it

because supervening events have rendered it impossible for the company to repudiate or violate the arbitration award.  Def.'s Mot. to Dismiss, ECF No. 154-2 at 6–7, 13.

The Constitution of the United States limits the "judicial Power" to resolving "Cases" and "Controversies."  U.S. Const. art. III, § 2.  To satisfy the case-or-controversy requirement, a plaintiff must show that she has "suffered an injury in fact," that the defendant can remedy the harm, and that a live dispute exists.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  As to the third imperative, a claim is not "amenable to . . . the judicial process," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998), when it turns on "contingent future events that may not occur as anticipated, or indeed may not occur at all," *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)), and when no hardship results from a court withholding consideration of the claim, *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)); *see also OverDrive Inc. v. Open E-Book F.*, 986 F.3d 954, 958 (6th Cir. 2021) (suggesting that "the second inquiry [should] merge into the first").

The Court lacks subject-matter jurisdiction over CNX because there is no live case or controversy between the Union (or Fink) and CNX.  If CNX tried tomorrow to revisit, overhaul, or restructure the health benefit plans it would have no power to do so.  CNX severed all ties with the subsidiaries; it has no legal, practical, or operational ability to either comply with or violate the arbitration award; nor may it alter the level or duration of the health care afforded to the plan participants.  Binding CNX to the arbitration award therefore would not change the status quo nor would it redress any alleged harm suffered by the Union or its members.

The Union fights this conclusion by recommending that the Court adopt the findings of the transferor court, which, the Union argues, included the determination that the case-or-controversy

requirement had been met with regards to CNX.  *See* Pls.'s Mem. in Opp'n to Def.'s Mot. to Dismiss, ECF No. 157 at 9.  That argument, however, fails for three reasons.  First, the transferor court did not decide whether the case-or-controversy requirement had been met regarding claims against CNX.  That court instead decided that it possessed statutory jurisdiction under § 301 of the Labor Management Relations Act over the spun-off corporation.  *See International Union, UMWA v. Consol Energy, Inc.*, 243 F. Supp. 3d 755, 762 (S.D. W. Va. 2017); *see also* Transferor Op. at 16 ("Like it has already done once previously, . . . the court upholds its prior ruling on this issue and finds that there is subject matter jurisdiction over CONSOL on the LMRA claim.").  Second, even assuming that the transferor court decided the case-or-controversy question with regards to CNX (which it did not), this Court is not bound by the discretionary law-of-the-case doctrine. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988).[5]  Third, whether a plaintiff has satisfied the case-or-controversy requirement with regard to a specific defendant remains a live question throughout all stages of litigation, including after a case has been transferred. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (stating that "an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation").

One last point.  Though the Court recognizes the bedrock principle of corporate separateness, *see United States v. Best Foods*, 524 U.S. 51 (1998), it does not turn a blind eye to corporate shenanigans used from time to time to shield one company from a related (or former)

---

[5] "Although failure to adhere to the law of the case doctrine may in some cases constitute abuse of discretion, adherence to the doctrine is not mandatory." *Moore v. Hartman*, 332 F.Supp.2d 252, 256 n.6 (D.D.C. 2004).  Courts should as a general practice, however, follow the law-of-the-case doctrine even "it does not limit the tribunal's power." *Arizona v. California*, 460 U.S. 605, 618 (1983); *Sloan v. Urb. Title Servs., Inc.*, 770 F. Supp. 2d 216, 224 (D.D.C. 2011).

company's liability, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003).  No allegations of fraud surround the spinoff of CONSOL's subsidiaries nor CONSOL's evolution into CNX.  But allegations may change going forward.  And cutting tie with subsidiaries to evade financial liability may give rise to claims in some instances.  *RTC Mortg. Tr. 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 203 (S.D.N.Y. 2001); *Scarff Bros., Inc. v. Bischer Farms, Inc.*, 386 F. App'x 518, 523 (6th Cir. 2010).

## IV.    Confirmation of the Award

For the reasons set forth above, the Court will not vacate the award, but it also cannot enforce it against CNX.  But can the award be enforced against the subsidiaries?  All agree that the grievant who filed the ROD (Fink) did not allege a loss of any benefit.  Fink instead challenged the signatory employers' ability to unilaterally alter the health benefit levels of plan participants.  Although the Court has decided that the arbitration panel had the authority to issue the decision it did, and that the panel's decision drew its essence from the bargaining agreement, the Court declines to confirm the award based on the current briefing.

In particular, it is unclear how Fink, the Union, or any of the plan participants has standing to seek confirmation of the arbitration award.  The subsidiaries have not altered health benefit levels.  And neither the Union nor Fink have yet pointed to case law demonstrating that Article III injury arises merely from an arbitration award going unconfirmed.

The Court therefore requests additional briefing on two issues.  The first is whether Fink, the Union, or any of the plan participants presently has Article III standing to seek confirmation of the arbitration award.  The second and related question is whether Fink, the Union, or any of the plan participants would have standing to seek confirmation of the arbitration in the event the

subsidiaries take steps inconsistent with the award.  Stated differently, can the Court confirm the award at some future time in the event a harm arises from the subsidiaries' conduct?

### V.    Conclusion

For the foregoing reasons, CNX's motion to dismiss for lack of jurisdiction is **GRANTED**. The subsidiaries' cross-motion for summary judgment is **DENIED** without prejudice, and the Union's motion for summary judgment is **DENIED** without prejudice.  The Court will resolve those motions after receiving the Parties' supplemental briefing.  An Order will be entered contemporaneously with this Memorandum Opinion.

It is so **ORDERED**.

DATE:  September 30, 2021

_____
CARL J. NICHOLS
United States District Judge